UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONSTANTE P. BAROT *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALDON MANAGEMENT, <br><br> *Defendant*. | Civil Action No. 18-140 (TJK) |

### MEMORANDUM OPINION

Plaintiffs Constante and Dolores Barot, a married couple proceeding pro se, sued Defendant Aldon Management under various federal and District of Columbia antidiscrimination and housing statutes. According to Plaintiffs, Aldon discriminated against them because of Mr. Barot's age and national origin by providing them with an apartment in the building where it employed Mr. Barot that was inferior to those it provided his co-workers. They also allege that their apartment violated the implied warranty of habitability under District of Columbia law because a bedroom window was not up to code. The parties cross-moved for summary judgment. Plaintiffs did not use the discovery process to develop factual support for their claims, and the undeveloped record here is fatal to those claims on summary judgment. Thus, the Court will deny Plaintiffs' motion, grant Aldon's, and enter summary judgment for Aldon.

I.  **Background**

   A.  **Factual Background**

In March 2003, Aldon Management, a property management company, hired Mr. Barot as a custodian and maintenance worker at one of its apartment complexes in the District of Columbia. ECF No. 1-2 at 8 ¶ 3. He is a Filipino man from the "Illocos" region of the Philippines who was

then in his late-50s. *Id*. As a condition of his employment, Aldon required him and his wife to live in an apartment on site. ECF No. 77-7. Plaintiffs' first lease restricted the apartment's occupancy to three people. ECF No. 77-6 at 1. And in July 2003, Plaintiffs began living there with their daughter. ECF No. 77-6 at 1; ECF No. 77-3 at 21. In 2009, their daughter's husband moved in too. ECF No. 79 at 36. The parties revised their lease agreement to add him and raise the maximum occupancy to four adults. *Id*. In 2011, their daughter had a son. ECF No. 1-2 at 9 ¶ 12. The child resided in the apartment with his parents and Plaintiffs until at least 2017, but his name never appeared on the lease. *See* ECF No. 79 at 39; ECF No. 1-2 at 9. At first, Aldon did not charge Plaintiffs rent. But addenda to the lease agreement in 2008 and 2009 required them to pay $229 per month—25 percent of what the public would have had to pay, or a 75 percent rent concession. ECF No. 1-2 at 75–76.

Although Plaintiffs' apartment had two bedrooms, the record is silent whether, when they first leased it, Aldon formally classified it as a one- or two-bedroom unit. Aldon restricts occupancy for a one-bedroom unit to two adults and one child; for a two-bedroom unit, the limit is four adults and one child. ECF No. 79 at 38.

According to Plaintiffs, in May 2017, Aldon's agents inspected the apartment and discovered that it was listed as a one-bedroom unit in their computer system. *See* ECF No. 79 at 11. Plaintiffs believe that before they moved in, Aldon converted the unit from a one-bedroom to a two-bedroom by constructing a wall between the community laundry room and the apartment to create another bedroom. *See* ECF No. 79 at 15. They insist doing so would have been unlawful.

Plaintiffs also contend that after making this discovery, Aldon's Vice President, Maria Rico, instructed the building manager to prepare a new lease. They insist that not long afterward, Aldon proposed a new lease agreement that would have allowed only Plaintiffs to remain as tenants

2

in the apartment.  ECF No. 77-2 at 37.  Plaintiffs refused to sign the proposed lease, and the next day Mrs. Barot sent Aldon a letter criticizing the proposal and accusing Aldon of housing their family in an "illegal" apartment while providing other maintenance workers with "real" two-bedroom apartments.  ECF No. 79 at 43.

During and following this incident, Plaintiffs filed discrimination charges with several administrative agencies.  *See* ECF Nos. 77-16–18.  A representative from the District of Columbia's Department of Consumer and Regulatory Affairs ("DCRA") visited the apartment and reported that one of its bedroom windows "did not meet today's building code requirement for egress."  ECF No. 77-16 at 3.  According to Mr. Barot, the representative called Aldon to obtain more records for his investigation but failed to reach anyone.  ECF No. 77-2 at 32.  In any event, as far as the record shows, DCRA did not pursue the matter further.  *See id.* at 33.  While Plaintiffs pursued complaints with these agencies, Rico purportedly threatened to take away their rent concession if they continued to do so.  ECF No. 79 at 17.

Plaintiffs remained tenants in the apartment until February 2019, when Aldon eliminated Mr. Barot's position as part of a workforce reduction initiative across the company's properties.  *See* ECF No. 79 at 61; ECF No. 77-3 at 21.  Mr. Barot refused to sign a separation agreement that would have required him to waive his legal claims against Aldon in return for $7,986.23 of separation pay.  ECF No. 79 at 61–63; ECF No. 77-3 at 22.  Plaintiffs no longer live in the apartment or anywhere on Aldon's property.  ECF No. 77-2 at 9.

**B.      Procedural Background**

After exhausting their administrative remedies with various federal and District of Columbia agencies, Plaintiffs filed a complaint in D.C. Superior Court, which Aldon removed to this Court in January 2018.  Plaintiffs brought claims under Title VII of the Civil Rights Act, the Age

Discrimination and Employment Act ("ADEA"), the Fair Housing Act ("FHA"), the District of Columbia Human Rights Act ("DCHRA"), and several provisions of District of Columbia landlord-tenant law. *See* ECF No. 1-2 at 16.

Not long after, Aldon moved to dismiss the complaint for failure to state a claim. The Court granted the motion in part and denied it in part. It dismissed each of Plaintiffs' claims under District of Columbia landlord-tenant law, save their claim that Aldon breached the implied warranty of habitability by creating a "fire hazard" and "dangerous" apartment through the noncompliant window. ECF No. 19 at 5–7. The Court also denied the motion as to Plaintiffs' discrimination claims. *Id.* at 2–5.

In June 2019, the Court appointed counsel for Plaintiffs for the limited purpose of assisting them with mediation and, a few months later, referred the case to mediation. *See* ECF No. 30. But a dispute arose about whether Plaintiffs could revoke a purported settlement agreement, and the Court referred the issue to the Dispute Resolution Compliance Judge. *See* Local Civil Rule 84.10. Eventually, that judge's resolution of the matter was appealed to the D.C. Circuit. *Barot v. Aldon Mgmt.*, No. 20-7083, 2021 WL 7369141 (D.C. Cir. Oct. 19, 2021). Eventually, the case landed back before this Court, with Plaintiffs once again proceeding pro se. The parties have now cross-moved for summary judgment. ECF Nos. 77, 79.

## II. Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).

"The movant bears the initial burden of demonstrating that there is no genuine issue of material fact." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). "In response, the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue." *Id.* And for claims where the nonmovant bears the burden of proof at trial, she must make an evidentiary showing "sufficient to establish the existence of [each] essential element to [her] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and therefore entitles the moving party to "judgment as a matter of law." *Id.* at 323. "Importantly, while summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 17 (D.D.C. 2009) (cleaned up).

To survive summary judgment, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotes omitted). But where the nonmoving party relies heavily upon his or her own uncorroborated statements in depositions and interrogatory responses to create a genuine issue of material fact, the Court must carefully assess whether such evidence is "merely colorable," or whether it "is such that a reasonable jury could return a verdict" in that party's favor. *Slate v. Am. Broad. Companies, Inc.*, 941 F. Supp. 2d 27, 39 (D.D.C. 2013) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986)). On the one hand, the Court must accept all the non-movant's evidence as true and give him the benefit of all justifiable inferences. *See id.* On the other hand, "generalized, conclusory" allegations, "uncorroborated by any evidence other than the

5

[nonmovant's] own deposition testimony," are "insufficient to establish a triable issue of fact"—at least where the circumstances reasonably suggest that corroborating evidence should be available. *Akridge v. Gallaudet Univ.,* 729 F. Supp. 2d 172, 183 (D.D.C. 2010); *see also Gen. Elec. Co. v. Jackson,* 595 F. Supp. 2d 8, 36 (D.D.C. 2009) (observing that when a "declaration is self-serving and uncorroborated" it is "of little value at the summary judgment stage").

The Court recognizes that Plaintiffs proceed pro se. Although pro se plaintiffs benefit from relaxed *pleading* standards, this "leeway does not extend to the *evidence* required at summary judgment, as courts hold *pro se* plaintiffs to the same evidentiary burdens and presumption as represented plaintiffs." *Penkoski v. Bowser*, 548 F. Supp. 3d 12, 20 (D.D.C. 2021) (citing *Prunte v. Univ'l Music Grp., Inc.*, 669 F. Supp. 2d 15, 21–22 (D.D.C. 2010), *aff'd*, 425 F. App'x 1 (D.C. Cir. 2011)); *see also Parr v. Ebrahimian*, 70 F. Supp. 3d 123, 127 n.2 (D.D.C. 2014) ("Although [plaintiff's] pleadings are read liberally, the same summary judgment standard applies, notwithstanding her pro se status.").

**III.    Analysis**

The undeveloped record before the Court forecloses any path to trial for Plaintiffs. Indeed, the Court has hardly anything more before it now than at the motion-to-dismiss stage, when it held that Plaintiffs' discrimination claims "just barely pass[ed] muster." ECF No. 30 at 4. Plaintiffs served no interrogatories, did not request the production of any documents, and did not depose any witnesses. With that, the Court is left with little more than their own self-serving and uncorroborated testimony. And on the record here, that is not enough to carry their claims to trial—no less to support judgment in their favor.

The Court will first address Plaintiffs' discrimination claims, which all suffer the same defect: the record lacks evidence that Plaintiffs' apartment was inferior to that provided to any of Mr. Barot's co-workers. Without such evidence, a reasonable jury could not conclude that Aldon

6

discriminated against Plaintiffs under Title VII or the AEDA, or that Aldon provided them inferior housing in violation of the Fair Housing Act and the DCHRA. Then the Court will turn to Plaintiffs' claim that Aldon violated the implied warranty of habitability. For similar reasons, Aldon is entitled to summary judgment on that claim as well.

### A. Discrimination Claims

Each of Plaintiffs' discrimination claims—under Title VII, the AEDA, the FHA, and the DCHRA—stem from one, central factual allegation: that Aldon leased them a one-bedroom apartment that had been illegally reconstructed into an inferior two-bedroom apartment instead of a standard one.[1] But on the record before the Court, no reasonable jury could conclude that Plaintiffs' apartment was inferior to any other two-bedroom apartment occupied by a co-worker comparable to Mr. Barot. Without such evidence, nothing supports an inference that Aldon treated Mr. Barot worse than employees outside his protected class or that Aldon was motivated by discriminatory intent.

#### 1. Title VII

First, Plaintiffs claim that Aldon violated Title VII by providing them housing—a condition of Mr. Barot's employment—that was "illegal, smaller and inferior" than, as well as "different" from, Mr. Barot's co-workers' housing, because he is Filipino. ECF No. 79 at 20. Title VII prohibits "discriminating against [an] employee with respect to the terms, conditions, or privileges

---

[1] In their opposition and cross-motion, Plaintiffs—for the first time—attempt to advance a claim that Aldon unlawfully retaliated against Mr. Barot by firing him in response to their protected activity, in violation of Title VII. *See* ECF No. 79 at 20. But the complaint does not state a claim for Title VII retaliation. *See* ECF No. 1-2 at 7–16. And "[i]t is well established that . . . plaintiff[s] cannot broaden [their] complaint in a summary-judgment . . . brief." *Chatman v. Perdue*, No. 17-cv-1826 (JEB), 2020 WL 6075678, at *4 (D.D.C. Oct. 15, 2020); *see also DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 84 (D.D.C. 2007). Plaintiffs only brought a claim for retaliation under D.C. Code § 42-3505.02, which the Court dismissed for failure to state a claim. ECF No. 19 at 7 (citing *Twyman v. Johnson*, 655 A.2d 850, 855–58 (D.C. 1995)).

of employment" on account of the employee's national origin. *Chambers v. Dist. of Columbia*, 35 F.4th 870, 872 (D.C. Cir. 2022) (en banc); *see also* 42 U.S.C. § 2000e-2(a)(1).

"Where, as here, the plaintiff has no direct evidence that the adverse employment actions of which [they] complain[] were caused by prohibited discrimination, [courts] analyze the claim under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003). In disparate-treatment cases, a plaintiff must show "(1) the plaintiff is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 255 (D.D.C. 2017) (quoting *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006)) (cleaned up). If a plaintiff makes that prima facie showing, "the burden 'must shift to the employer to articulate some legitimate, nondiscriminatory reason for the' adverse action." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). The burden then shifts back to the plaintiff to show pretext.

As the D.C Circuit recently held, the second element does not require a showing that the plaintiff suffered objectively tangible harm, only that the employer's action affected the terms, conditions, or privileges of the plaintiff's employment. "Once it has been established that an employer has discriminated against an employee with respect to that employee's terms, conditions, or privileges of employment because of a protected characteristic, the analysis is complete;" there need not be any "objectively tangible harm." *Chambers*, 35 F.4th at 874–75 (overruling *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999)). That said, "the phrase ['terms, conditions, or privileges of employment'] is not without limits" because "not everything that happens at a workplace affects an employee's 'terms, conditions, or privileges of employment.'" *Id.* at 874; *see also id.* at 876

(harm may not be "trivial" (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006)).

Aldon does not offer a nondiscriminatory explanation for its conduct. Instead, it argues that Plaintiffs have failed to make out a prima facie case.[2] The Court agrees that the record here does not support a prima facie case of discrimination, and so Aldon is entitled to summary judgment.

Most obviously, Plaintiffs come up short on the third element of the prima facie case—whether Aldon's conduct gives rise to an inference of discrimination. To support that inference, Plaintiffs assert that as compared to Mr. Barot's "American counterparts," their apartment was "illegal, smaller and inferior." ECF No. 79 at 20. Of course, a "plaintiff can raise an inference of discrimination by showing 'that [he] was treated differently from similarly situated employees who are not part of the protected class.'" *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)). But to do so, the plaintiff must "produce evidence suggesting that the employer treated other employees of a different race [or national origin] . . . more favorably *in the same factual circumstances*." *Burley v. Nat'l Passenger Rail Corp.*, 33 F. Supp. 3d 61, 73 (D.D.C. 2014) (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008)) (cleaned up). And "all of the relevant aspects of" a comparator's

---

[2] Aldon relies on *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999), to argue that the Title VII claim fails because Plaintiffs have not shown an adverse action resulting in "objectively tangible harm." *See* ECF No. 77-1 at 13 (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) and *Brown*, 199 F.3d at 452). But as noted above, the D.C. Circuit overruled *Brown* in *Chambers*, holding that a harm, to be actionable, need not be "objectively tangible." Still, for the reasons explained, the Court agrees that Plaintiffs have not made out a prima facie case for substantially the same factual reasons: that there is no evidence that Aldon treated Mr. Barot worse than employees outside his protected class or any other evidence that Aldon was motivated by discriminatory intent.

9

and the plaintiff's "employment situations must have been nearly identical." *Id.* (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)) (cleaned up).

Plaintiffs point to two plausible comparators: "Mr. Weaver," a black maintenance worker, and "Mr. Herring," another black maintenance worker.[3] *See* ECF Nos. 79 at 20, 77-14 at 6. But their argument is lacking on two fronts. First, on the record before it, no reasonable jury could conclude that Mr. Barot's and any comparator's "employment situations" were "nearly identical." *See Burley*, 33 F. Supp. 3d at 73 (quoting *Holbrook*, 196 F.3d at 261). And second, on this record no reasonable jury could conclude that Aldon intentionally treated any of these employees "more favorably" than Mr. Barot. *See id.* (quoting *Brady*, 520 F.3d at 495).

First, the only information in the record suggesting that Weaver and Herring are "similarly situated" to Mr. Barot is Plaintiffs' assertion that they were also maintenance workers. *See* ECF No. 77-14 at 6–7. But there is no information in the record about, say, the nature of their work, their relative seniority, or the terms and conditions of their employment. *See Burley*, 33 F. Supp. 3d at 73 ("Factors relevant to the [comparator] inquiry include whether the alleged comparators . . . have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's

---

[3] Plaintiffs also identify two Filipino co-workers from different regions of that country. *See* ECF No. 79 at 20. These employees are not proper comparators because they share Mr. Barot's protected characteristic—his Filipino origin. Nothing in the record suggests there are "unique historical, political and/or social circumstances" of the region in the Philippines from which Mr. Barot originated that warrant distinguishing between Mr. Barot and these other co-workers. *See Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 762 n.3 (3d Cir. 2004) (noting that although "'[n]ational origin' usually refers to the country where a person was born, . . . [i]n some cases, . . . courts have been willing to expand the concept . . . to include claims from persons such as cajuns or serbs based upon the unique historical, political and/or social circumstances of a given region" (quotation and citations omitted)).

treatment of them for it." (quotation omitted)).  Plaintiffs' Title VII claim comes up short for this reason alone, full stop.

Second, even assuming Weaver and Herring are proper comparators, the record does not support a reasonable inference that Aldon treated them differently than Mr. Barot at all—no less with discriminatory intent.  Plaintiffs insist that Aldon provided Weaver and Herring "real" two-bedroom apartments rather than their "illegal, smaller and inferior" converted one bedroom.  ECF No. 79 at 20.  The Court first notes that there is no evidence in the record other than Plaintiffs' own self-serving statements that Weaver and Herring resided in two-bedroom apartments at all, and the evidence that Aldon had converted Plaintiffs' unit from a one-bedroom to a two-bedroom is scant.[4]  But even assuming the record is sufficient to sustain these allegations, it lacks any evidence that Aldon "illegally" converted Plaintiffs' unit, that after it was converted it was "smaller" than Mr. Barot's co-workers' apartments, or that it was otherwise inferior in any way.  On the first point, the DCRA inspector who visited Plaintiffs' apartment expressly noted that he would have to investigate further to determine whether the unit had been constructed illegally.  *See* ECF No. 79 at 45.  As far as the record shows, no such investigation took place.  *See* ECF No. 77-2 at 32–33.  Nor is there evidence in the record about the size, features, or general quality of *any* apartment.  In fact, the record shows that up to five people lived together in Plaintiffs' apartment for years, just as they might have in other two-bedroom units.  *See* ECF No. 79 at 36.  So even if Aldon had converted Plaintiffs' apartment from a one-bedroom into a two, there is nothing in the record on which a jury could conclude that their unit was inferior to Mr. Barot's co-workers' apartments.

---

[4] None of Plaintiffs' lease agreements with Aldon specify the number of bedrooms in the apartment.  *See generally* ECF Nos. 77-6, 77-7, 77-8, 77-9, 77-10.  That said, some evidence in the record supports an inference that the apartment was, at one time, a one-bedroom unit.  *See* ECF No. 79 at 43 (Mrs. Barot's contemporaneous letter to Aldon recounting that Rico had said Aldon's records show the apartment was a one-bedroom).

11

The evidence from which Plaintiffs try to create a genuine dispute over the relative quality of their apartment doesn't do the trick. First, they emphasize that Weaver's rent is $5 less per month than theirs. *See* ECF No. 79 at 22; *compare* ECF No. 1-2 at 75 (setting Mr. Barot's rent at $229/month) *with id.* at 78 (setting Weaver's rent at $224/month). But that distinction is *de minimis* to say the least. In any event, with no evidence about the relative quality and features of Plaintiffs' and Weaver's respective apartments, no reasonable jury could conclude that this rent difference suggests that Mr. Barot was treated worse than Weaver, or that it supports an inference of discrimination on Aldon's part.

Second, Plaintiffs point to evidence they say shows that one of the bedroom windows in their apartment did not comply with local building codes. ECF No. 77-16 at 3. The 2017 inspection report documents that the only window in one of the bedrooms was higher than the other windows in the apartment and, thus, "does not met today's building code requirement for egress." *Id.* The report notes further that DCRA planned to get the records for the apartment and take action "if it can be proved that [the second bedroom] was illegally built," but there is no evidence in the record of further action. *Id.* Perhaps a jury could draw an inference that the second bedroom was cobbled together after-the-fact or somewhat different from the first bedroom. But even then, no evidence suggests that Weaver's and Herring's apartments were any different, or fully code-complaint. On top of all that, there is no basis in the record to infer that anyone at Aldon ever even knew about this problem. Thus, even if the window were not up to code—certainly, a problem— that alone does not support an inference of disparate treatment or discrimination, either.

Third, and finally, Plaintiffs highlight a letter that Mrs. Barot wrote in 2017 rebuffing Aldon's proposal that Plaintiffs sign a new lease contract for only two occupants, arguing that Aldon's proposal suggests they knew the apartment was an "illegal" two-bedroom apartment inferior

12

to those of Mr. Barot's co-workers. *See* ECF No. 79 at 43. But this, too, is unavailing. Even if the Court could find that the letter raises a genuine dispute over whether Aldon tried to reduce the occupancy limits on Plaintiffs' apartment—and from that, make the leap to infer that Plaintiffs were not leased a "true" two-bedroom apartment—once again, the record is silent about the size or quality of the apartments occupied by Mr. Barot's co-workers. Whatever a reasonable jury could infer from this record about Aldon's conduct as a landlord, it could not infer that Aldon discriminated against Plaintiffs because of Mr. Barot's national origin.

At bottom, Plaintiffs could have deposed Aldon's agents and any of the employees they identify as purported comparators to develop a record to support their prima facie case. They didn't. On this record, no reasonable jury could find that Aldon treated any similarly situated co-worker of Mr. Barot more favorably than him in terms of the housing it provided, and no reasonable jury could infer that Aldon acted with discriminatory intent. Thus, Aldon is entitled to summary judgment on Plaintiffs' Title VII claim. *See Burley*, 33 F. Supp. 3d at 73.

    2.    **ADEA**

Plaintiffs also allege that Aldon assigned them inferior housing on account of Mr. Barot's age, in violation of the ADEA. But this claim must fail for similar reasons.

An employer violates the ADEA if it "discriminate[s] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The "essential elements" of an age discrimination claim are that "the plaintiff suffered an adverse employment action . . . because of the plaintiff's . . . age." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). Courts apply Title VII's framework to ADEA claims, including the standards for evaluating comparator evidence. *See Forman v. Small*, 271 F.3d 285, 292 (D.C. Cir. 2001) ("This circuit applies to ADEA cases the scheme for allocating evidentiary burdens that has evolved in Title VII discrimination cases.") (citation omitted);

13

*Townsend v. United States*, 236 F. Supp. 3d 280, 307 (D.D.C. 2017) ("To raise an inference of discrimination based on comparator evidence, the plaintiff must demonstrate: (1) that 'all of the relevant aspects of [his] employment situation were nearly identical to those of the [other] employee'; and (2) that the comparator was 'charged with offenses of comparable seriousness' but treated more favorably." (quoting *Burley*, 801 F.3d at 301)).

The record does not permit a reasonable jury to infer that Aldon leased Plaintiffs an inferior apartment on account of Mr. Barot's age. Plaintiffs base their age-discrimination claim on the premise that "Mr. Barot was the oldest among his comparators when the apartment was offered/provided to him." ECF No. 79 at 23. But the record does not include the age of any similarly situated co-worker. In fact, while Mr. Barot stated that Weaver was 52, Herring was in his "30's," and another employee was in his "60's" in his EEOC complaint, *see* ECF No. 77-14 at 6–7, he then testified at his deposition that he did not know these individuals' ages, and he did not "know where that information [in the complaint] came from," ECF No. 77-3 at 25–26; *see also* ECF No. 77-2 at 24–25, 29–30 (Mrs. Barot explaining that Mr. Barot provided all the ages in the complaint). Without that information, no reasonable jury could conclude that Mr. Barot was significantly older than any of his purportedly similarly situated co-workers, defeating any possible inference of discrimination. *See Townsend v. United States*, 236 F. Supp. 3d 280, 307 (D.D.C. 2017) (dismissing an age-discrimination claim in part because "the plaintiff [did] not plead [the comparator's] age," so "no inference can be drawn that [the comparator] was 'significantly younger' than the plaintiff, undercutting any inference that age was a factor for any alleged disparate treatment between [the comparator] and the plaintiff" (citing *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)).

Beyond that, even if Plaintiffs had identified a proper comparator, the fatal defect in their Title VII claim—that the record lacks evidence of their apartment's features and condition relative to any of his co-workers'—equally dooms their age-discrimination claim. So the Court will grant summary judgment to Aldon on the Barots' ADEA claim as well.

### 3. Housing Discrimination

Last of the discrimination claims, Plaintiffs charge that Aldon violated the FHA and DCHRA for providing them inferior housing based on their national origin and age, in violation of both the FHA and DCHRA.[5] To prove that a defendant violated the FHA or DCHRA, a plaintiff "must establish . . . that the defendant intentionally discriminated against them on the basis of [national origin]" or other protected class. *2922 Sherman Ave Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 682 (D.C. Cir. 2006); 42 U.S.C. § 3604(b) (including national-origin discrimination). Here too, courts apply the same Title VII burden-shifting framework to housing-discrimination claims. *See Boykin v. Gray*, 895 F. Supp. 2d 199, 207 (D.D.C. 2012); *see also Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393, 405 (D.D.C. 1996) ("The D.C. courts have always looked to cases from the federal courts in interpreting the D.C. Human Rights Act, and have followed, wherever applicable, precedents from the federal courts' treatment of comparable civil rights statutes.").

Plaintiffs' housing-discrimination claims are coextensive with their disparate-treatment claims under Title VII and the ADEA. Aldon is thus entitled to summary judgment on these claims for the same reasons— that no reasonable jury could either conclude that Aldon provided Plaintiffs

---

[5] In their briefing, Plaintiffs try to add a claim for discrimination based on familial status. ECF No. 79 at 23; ECF No. 82 at 15. But the complaint only states an FHA claim for discrimination based on national origin. *See* ECF No. 1-2 at 13. Again, Plaintiffs cannot amend their complaint through summary-judgment briefing. *See Chatman*, 2020 WL 6075678, at *4.

an apartment that was inferior to that of his co-workers or infer that Aldon acted with discriminatory intent.[6]

### B. Warranty of Habitability

Plaintiffs also charge Aldon with violating the implied warranty of habitability because their unit did not comply with District of Columbia housing regulations. Under District of Columbia law, "a landlord's failure to comply with [D.C.] housing regulations constitutes a privately-enforceable breach of the warranty of habitability." *Parham v. CIH Props., Inc.*, 208 F. Supp. 3d 116, 124 (D.D.C. 2016) (citing *Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1082 (D.C. Cir. 1970)); *see also* 14 D.C.M.R. § 301. The warranty "creates for landlords a continuing duty during the lease term to 'exercise reasonable care to maintain rental premises in compliance with the [D.C.] housing code.'" *Parham*, 208 F Supp. 3d at 124 (alteration in original) (quoting *George Wash. Univ. v. Weintraub*, 458 A.2d 43, 47 (D.C. 1983)); *see also Childs v. Purll*, 882 A.2d 227, 234 (D.C. 2005) ("[T]he Housing Regulations impose numerous duties on landlords and their agents to keep residential premises safe and habitable, and not to rent habitations that are unsafe."). But "a tenant can recover damages for a landlord's breach of the warranty of habitability only if the landlord did not cure the violation of the housing code at issue within a reasonable amount of time after the landlord received actual or constructive notice of the defective condition." *Parham*, 208 F Supp. 3d at 125. Additionally, *de minimis* violations of housing regulations that "do not affect habitability" do not suffice to prove a landlord breached the warranty. *See Arthur v. Dist.*

---

[6] Plaintiffs argue that they need not show Aldon discriminated against them intentionally under a disparate-impact theory. *See* ECF No. 79 at 25–26. But they have produced no evidence of a "policy or practice [that] ha[d] a disproportionate effect on [their] protected class." *2922 Sherman Ave. Tenants' Ass'n*, 444 F.3d at 679.

*of Columbia Housing Auth.*, No. 18-cv-2037 (DLF), 2020 WL 3869725, at *3 (D.D.C. July 8, 2020) (quoting *Javins*, 428 F.2d at 1082 n.63).

Plaintiffs assert that Aldon breached the implied warranty of habitability by creating a fire hazard when it converted the apartment from a one-bedroom to a two-bedroom unit. ECF No. 79 at 26. They lean on the DCRA inspector's report, which noted that the second bedroom's window "[did] not meet today's building code requirement for egress." ECF No. 77-16 at 3. But as far as the record shows, the DCRA never pursued any sort of enforcement action or followed up.

Even assuming the report is enough to create a triable question of fact as to whether Aldon violated a housing regulation, there is no information in the record from which a reasonable jury could conclude such a violation was anything more than *de minimis*. Neither the inspector's report nor Plaintiffs cite a specific housing regulation the bedroom window violated or suggest the extent of the window's deviation from that standard. And Plaintiffs have not otherwise pointed to evidence in the record showing how this purported violation affects the unit's habitability. Moreover, even if the second-bedroom window materially violated District of Columbia housing regulations, there is no evidence on which a jury could conclude that the company ever knew or should have known about the violation. *See Parham*, 208 F Supp. 3d at 125. According to Plaintiffs, the inspector tried to reach management but could not make contact with them. ECF No. 77-2 at 32. And as Aldon points out, nothing in the record suggests that the window would have violated building codes when Aldon constructed the unit at least sixteen years before the inspection. *See* ECF No. 77-16 at 3. Therefore, Aldon is entitled to summary judgment on this claim.

**IV.     Conclusion**

For all these reasons, the Court will grant Aldon's Motion for Summary Judgment, ECF No. 77, and deny the Barots' cross-motion, ECF No. 79. A separate order will issue.

                                                         /s/ Timothy J. Kelly  
                                                         TIMOTHY J. KELLY  
                                                         United States District Judge

Date: September 22, 2023